[Cite as *Gilson v. Am. Inst. of Alternative Medicine*, 2016-Ohio-1324.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

Tamar Gilson,                                              :

     Plaintiff-Appellee/                           :
     Cross-Appellant,

                                :

v.                                                        :                 No. 15AP-548

                                :        (C.P.C. No. 13CVH-5942)

American Institute of Alternative
Medicine et al.,                                          :        (REGULAR CALENDAR)

     Defendants-Appellants/                        :
     Cross-Appellees.

                                :

---

## D E C I S I O N

Rendered on March 29, 2016

---

**On brief:** *Michael Garth Moore* and *Charley Hess*, for appellee/cross-appellant. **Argued:** *Michael Garth Moore* and *Charley Hess*

**On brief:** *Bailey Cavalieri LLC* and *Tiffany C. Miller*, for appellants/cross-appellees. **Argued:** *Tiffany C. Miller*

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendants-appellants/cross-appellees, American Institute of Alternative Medicine ("AIAM"), Diane Sater, and Helen Yee (collectively "defendants"), appeal from judgments of the Franklin County Court of Common Pleas denying defendants' motion for summary judgment, denying defendants' Civ.R. 60(B) motion for partial relief from judgment, overruling defendants' objections and adopting the magistrate's decision issued after the jury's verdicts, and overruling objections and adopting the magistrate's decision on attorney fees. Plaintiff-appellee/cross-appellant, Tamar Gilson, has filed a

cross-appeal from the court's decision overruling objections and adopting the magistrate's decision on attorney fees.  For the reasons which follow, the judgments of the trial court are affirmed in part and reversed in part.

## I.  BACKGROUND

{¶ 2}   On May 29, 2013, Gilson filed a complaint against defendants alleging one count of age discrimination. On July 19, 2013, defendants filed an answer and a counterclaim asserting one claim of defamation. On December 24, 2013, Gilson amended her complaint, adding a claim for defamation.

{¶ 3}   The events giving rise to the claims occurred when Gilson was employed as AIAM's Nursing Program Administrator ("NPA") from August 2011 to December 2012. AIAM is a business which runs a school offering programs in massage therapy, acupuncture therapy, practical nursing, and registered nursing.  Sater and Yee are the owners of AIAM; Sater is the CEO and Yee is the CFO.  The Ohio Board of Nursing ("OBN") regulates and monitors AIAM's practical nursing ("PN") and registered nursing ("RN") programs.

{¶ 4}   Gilson has held a registered nursing license since 1964.  Gilson began her career working as a nurse at Children's Hospital in Columbus, Ohio.  Gilson worked for Children's Hospital for 30 years, eventually rising to the rank of director of nursing. After leaving Children's Hospital, Gilson entered the field of nursing education.  She has worked at several colleges and institutions.

{¶ 5}   Gilson initially began working for AIAM as a consultant.  Gilson explained that when she began working with AIAM, the school's National Council Licensure Examination ("NCLEX") exam scores were "extremely low."  (Tr. Vol. II, 336.)  The NCLEX is a national certification examination for nurses.  As a consultant, Gilson hoped to help AIAM "develop."  (Tr. Vol. II, 337.)  Gilson worked as a consultant for AIAM for only three weeks; AIAM then offered Gilson the NPA position, which she accepted.

{¶ 6}   After Gilson became AIAM's NPA, she began to advocate for the school to raise its admission standards.   At a June 8, 2012 nursing curriculum committee meeting, the committee raised the school's admission standards.  Sater was not present at that meeting.

{¶ 7} Also in June 2012, AIAM began to implement a new associate degree in registered nursing ("ADRN") program, which essentially "required that we merge both the PN and the RN program together." (Tr. Vol. II, 290.) Darcy Kaplan, an education facilitator at AIAM, explained that developing the new ADRN program required a "tremendous amount of work" for Gilson on top of her NPA duties. (Tr. Vol. II, 291.)

{¶ 8} In October 2012, a nursing faculty member, Luana Tenge, resigned in the middle of the quarter. As NPA, Gilson was responsible for hiring faculty. However, AIAM had an extremely high faculty turnover rate, and by October 2012, Gilson stated that she had called all the contacts she had made throughout her nursing career and "asked [her] contacts to call others" to try to find faculty to work at AIAM. (Tr. Vol. II, 409.) Gilson explained that she could not find anyone to teach the classes on such short notice, so she began teaching some of Tenge's courses.

{¶ 9} Kaplan explained that the high faculty turnover was due in part to "incivility and unrest on the part of the students," in addition to other issues such as pay and lack of benefits. (Tr. Vol. II, 258.) During summer 2012, AIAM received an anonymous letter threatening a "Virginia Tech type of episode" at the school. (Tr. Vol. II, 390.) On Gilson's first day of teaching Tenge's classes, Gilson allegedly had a student say to her, "how would you like a sharp knife in your back." (Tr. Vol. II, 414.) AIAM reported both of these incidents to the police.

{¶ 10} Elaine Hiatt became the academic dean for AIAM in October 2012. Gilson began to have weekly meetings with Sater at this time. At these meetings, Sater and Gilson would discuss "[o]perational issues, progress reports, just * * * the operations and where we're heading." (Tr. Vol. II, 394.) Sater lowered the school's admission standards in October 2012.

{¶ 11} On December 7, 2012, Hiatt told Sater that she could not "be ready for winter quarter with [Gilson] in this position. We have to get rid of [Gilson]." (Tr. Vol. I, 145.) Hiatt recommended that Sater discharge Gilson because, as of December 7, AIAM "didn't have sufficient clinical faculty in place," and "the schedule needed to have the nursing instructors assigned to classes." (Tr. Vol. IV, 787.)

{¶ 12} Thus, on December 7, 2012, Sater and Hiatt went into Gilson's office and told Gilson that the school no longer had a need for her. Gilson asked Sater if there

were any performance issues. Sater said "no" and told Gilson that she "had accomplished a lot." (Tr. Vol. III, 444.) Hiatt admitted that before going in to fire Gilson on December 7, Hiatt and Sater agreed "not to tell [Gilson] the real reason why she was being fired." (Tr. Vol. IV, 910.)

{¶ 13} Sater told Gilson that she would receive two weeks severance pay and that Gilson "needed to be responsible for signing the completion approval papers that go to the [OBN] for the graduates of the program." (Tr. Vol. III, 445.) Gilson agreed to sign the completion papers and "[t]o be available for phone calls if needed." (Tr. Vol. III, 445.) Gilson explained that after Sater left, Hiatt remained and Gilson "went through [her] calendar, and [she] discussed" the upcoming reports that were due to the OBN from AIAM, as well as other matters she had scheduled on her calendar. (Tr. Vol. III, 447.)

{¶ 14} Hiatt stated that she did not ask Gilson about any important upcoming deadlines during this meeting. Hiatt explained that she only stayed in Gilson's office because "it's company policy when you let someone go somebody has to stay there in the room, make sure nothing goes amiss." (Tr. Vol. IV, 929.) Hiatt noted that while Gilson "went through some things with" her during this final meeting, Hiatt just "said okay, okay, okay, because [Hiatt] felt [she] already had a better grasp on the program than [Gilson] did." (Tr. Vol. IV, 929.) Hiatt also explained that after December 7, 2012, Gilson was physically gone from AIAM, had no key to the building, and no access to any files.

{¶ 15} On December 20, 2012, Sater sent Jody Hostetler, the education regulatory surveyor for the OBN, a letter notifying the OBN of the change in AIAM's NPA. The letter stated that Gilson was "currently on vacation and will be working from home until December 28th. She is available during this time for any needs by phone and email, and is still meeting with the Dean on administrative issues." (Plaintiff's Exhibit 9.)

{¶ 16} On December 24, 2012, Hostetler called Sater and said that she had received "the notification about the change in our nursing program administrator, and she said that she hadn't received a report that was–was due." (Tr. Vol. IV, 690.) AIAM was supposed to submit an RN progress report to the OBN on December 21, 2012. Sater

told Hostetler that Gilson "had forgotten some things" and said that "obviously, this [was] another thing that hadn't gotten done." (Tr. Vol. IV, 690.) Hostetler stated that during this phone conversation, Sater told her that Gilson "was confused and unable to function in her role as a nurse." (Tr. Vol. II, 310.) Hostetler told Sater that based on the statements Sater had just made and because Gilson's nursing license qualified her to be an NPA, AIAM "need[ed] to report that as – as an employer." (Tr. Vol. IV, 691.)

{¶ 17} Hiatt wrote the RN progress report and submitted it to the OBN on December 27, 2012. As Hiatt wrote the report, she stated that she took "full responsibility" for the RN progress report. (Tr. Vol. IV, 930.) Hiatt emailed a copy of the RN progress report to Gilson on December 27, 2012, and asked Gilson if she would want to sign the report and turn it in to the OBN herself. Gilson did not respond to Hiatt's email that day, so Hiatt turned the report into the OBN without Gilson's signature.

{¶ 18} Duane Landrum, AIAM's director of admissions, stated that sometime after Gilson was fired, Sater told him that Gilson was "coming after the school" and that she needed Landrum to provide her with some instances where Gilson was "incompetent, where she was too old to do her job, you know." (Tr. Vol. III, 539.) Landrum also stated that from December 7, 2012 through the end of 2012, Sater lowered the admissions standards "three times." (Tr. Vol. III, 531.) Thus, by the end of 2012, AIAM's admission standards were lower than they had been in the summer of 2012 when the nursing curriculum committee raised them.

{¶ 19} On January 7, 2013, Sater filed a complaint against Gilson with the OBN. The complaint instructed the author to provide a brief description of the complaint or violation, and Sater wrote the following statement in the space provided:

> [Gilson] was our Nursing Program Administrator over both RN and PN programs. She became ineffective in her role due to forgetfulness and confusion. It became obvious to me when she was not able to finish the winter schedule, not remembering if she had hired faculty or assigned courses. She did not remember decisions that she had made and communicated in written form, and was angry when she "discovered" them being implemented. She was confused when presented with written documentation of her

> involvement in decisions, including texts and emails from herself.

(Plaintiff's Exhibit 4.)

{¶ 20} Sater admitted she understood that filing a complaint against a nurse with the OBN was "a very serious matter," and she stated that she only filed the complaint because Hostetler insisted that she file it. (Tr. Vol. I, 119.) The complaint instructed its author to provide the names and contact information of witnesses, and Sater listed herself and Hiatt as the two witnesses. Gilson testified that she was "horribly shocked and dismayed" when she saw the complaint, as it was "a terrible threat to [her] ability to work, * * * it's the worst fear." (Tr. Vol. III, 460-61.)

{¶ 21} The OBN requested further information from Sater about the complaint, and Sater wrote a letter responding to the OBN's request on April 12, 2013. Sater noted in the letter that in the summer of 2012, she "started noticing that [Gilson] was struggling with routine details, such as following established hiring steps." (Plaintiff's Exhibit 5.) Sater alleged that on December 7, 2012, she "discovered that [Gilson] missed sending in a report that was due on December 5. The report was done on November 29, ready for her signature and to send. [Gilson] just forgot to send it." (Plaintiff's Exhibit 5.) Sater also stated that on December 7, 2012, she discovered that Gilson had not yet hired staff to teach the winter quarter and that "[w]inter quarter started on December 16, 2012, yet she kept thinking that it started January 6, 2013." (Plaintiff's Exhibit 5.)

{¶ 22} Sater admitted in the letter that she had refused to discuss any performance issues with Gilson when firing her. Sater explained that she did so because she "could not face having to tell someone that [she] thought that they were losing cognitive abilities, that they were not up to a job that they used to be able to do with flair." (Plaintiff's Exhibit 5.) Regarding the December 21, 2012 RN progress report, Sater stated that Gilson "seemed to have forgotten about this report also, it was in her email completed but unprinted and unsigned." (Plaintiff's Exhibit 5.) Sater also asserted in the letter that "students were not offered appropriate clinical experiences" and that this was a matter that "seem[ed] to have fallen off [Gilson's] radar also."

(Plaintiff's Exhibit 5.)   The combination of all the statements that Sater made to the OBN about Gilson formed the basis for Gilson's defamation claim against defendants.

{¶ 23} On April 14, 2014, defendants filed a Civ.R. 56 motion for summary judgment.  Defendants asserted that they did not terminate Gilson's employment for any age related reason and asserted that the statements they made to the OBN were privileged statements of opinion.  Gilson filed a memorandum in response to the motion for summary judgment on April 25, 2014.

{¶ 24} The trial court issued a decision and entry denying defendants' motion for summary judgment on June 16, 2014.  Regarding defamation, the court concluded that Gilson had presented sufficient evidence to demonstrate a genuine issue of material fact regarding whether defendants "made a false report to the Board with actual malice." (June 16, 2014 Decision, 1.)  Specifically, the court noted that the timing of the allegations about Gilson's confusion and forgetfulness, coming immediately after AIAM failed to turn the RN progress report into the OBN on time, as well as the evidence that Gilson had difficulty retaining faculty and obtaining clinical sites, indicated that defendants had made the statements about Gilson with actual malice.  The court also determined that the statements at issue were statements of fact and not statements of opinion.

{¶ 25} On August 18, 2014, the parties entered into a stipulation, agreeing that a magistrate would preside over the jury trial of the matter.  The matter proceeded to a bifurcated trial on liability and punitive damages and attorney fees.  The liability portion of the trial occurred on August 18, 19, 20, 21, 26, and 27, 2014.  At the close of Gilson's case-in-chief, defendants moved for a directed verdict.  The magistrate denied the motion.

{¶ 26} At the end of the liability portion of the trial, the jury returned verdicts finding in defendants' favor on Gilson's age discrimination claim, in Gilson's favor on defendants' defamation claim, and finding in Gilson's favor on her defamation claim. The jury awarded Gilson $125,000 in compensatory damages on the defamation claim. In response to interrogatories, the jury indicated they had found that defendants made false statements about Gilson, which tended to injure her reputation or affected her adversely in her trade or business, and that defendants made these statements with

actual malice. Defendants moved for a judgment notwithstanding the verdict ("JNOV"), but the magistrate denied the motion.

{¶ 27} The matter proceeded to the punitive damages and attorney fees portion of the trial on August 27, 2014. The jury awarded Gilson $10,000 in punitive damages and found that she was entitled to recover her attorney fees. The magistrate scheduled a hearing to be held on October 7, 2014 to determine the amount of Gilson's attorney fees.

{¶ 28} On August 29, 2014, the magistrate issued a decision reflecting the jury's findings. Defendants requested that the magistrate issue findings of fact and conclusions of law, and the magistrate issued a decision containing findings of fact and conclusions of law on September 8, 2014.

{¶ 29} Defendants filed objections to the magistrate's decision on September 22, 2014, and later supplemented those objections on January 9, 2015. Defendants presented five objections for the court's review, asserting that the magistrate erred in (1) allowing Gilson's defamation claim to go to the jury, (2) allowing the jury to consider opinion statements, (3) denying defendants' motion for directed verdict, (4) denying defendants' motion for JNOV, and (5) not either entering a directed verdict or a JNOV on the attorney fees and punitive damages as Gilson had presented no evidence of actual damages. In their objection to the magistrate's decision, defendants asserted for the first time that they were entitled to immunity from Gilson's claims under R.C. 4723.341.

{¶ 30} On January 12, 2015, defendants filed a Civ.R. 60(B) motion for partial relief from the trial court's June 16, 2014 decision denying their motion for summary judgment. In the motion for partial relief, defendants asserted that the trial court had mistakenly failed to consider R.C. 4723.341 when ruling on defendants' motion for summary judgment. Defendants asserted that the statute provided them with a "special privilege against liability for this type of statement." (Motion for Partial Relief, 2.)

{¶ 31} In her decision on attorney fees rendered on March 27, 2015, the magistrate noted that Gilson's trial counsel, Michael Garth Moore, had billed 323.9 hours from the beginning of the case through the trial and that he billed an additional 22.1 hours from September 4 through October 6, 2014. The magistrate reviewed the billing records and determined that the first time Moore billed time in relation to the defamation claim occurred on December 4, 2013. The magistrate determined that

Moore had billed 36.9 hours prior to the December 4, 2013 entry. Thus, for purposes of the attorney fee award, the magistrate reduced the total number of hours to 309.1 hours (323.9 + 22.1 − 36.9) to deduct the time Gilson's counsel spent pursuing solely the unsuccessful age discrimination claim. The magistrate determined that Moore's hourly rate was $125 an hour, as that was the rate Gilson agreed to pay Moore in their contract. The magistrate then reviewed the factors under Prof.Cond.R. 1.5(a) and determined that the factors supported an upward adjustment, which the magistrate determined should be a multiplier of two. Thus, the court awarded Gilson attorney fees for Moore in the amount of $77,275 ($250 x 309.1) and litigation expenses in the amount of $3,436.89. The court also awarded Gilson $3,415 ($300 x 11.95) in fees for Charley Hess, who represented Gilson during the attorney fees hearing. Thus, the court entered a total fee award in Gilson's favor of $80,690.

{¶ 32} On April 8, 2015, Gilson filed an objection to the magistrate's decision on attorney fees, asserting the magistrate erred by using $125 an hour as Moore's hourly fee. Defendants filed an objection to the magistrate's decision on attorney fees on April 10, 2015, asserting that the magistrate erred by failing to divide the time Gilson's counsel spent on the successful, as opposed to the unsuccessful, claim.

{¶ 33} On April 27, 2015, the trial court issued a decision and entry overruling defendants' objections to the magistrate's decision issued after the jury's verdicts and adopting the magistrate's decision as its own. On April 27, 2015, the trial court also issued a decision and entry denying defendants' Civ.R. 60(B) motion for partial relief from the court's summary judgment decision. On April 29, 2015, the trial court issued a decision and entry overruling both Gilson's and defendants' objections to the magistrate's decision on attorney fees and adopting the magistrate's decision on attorney fees as its own. This appeal and cross-appeal timely followed.

## II. ASSIGNMENTS OF ERROR

{¶ 34} Defendants appeal, assigning the following errors for our review:

> [1.] The trial court erred in its summary judgment decision by denying judgment in favor of Appellants on Appellee's defamation claim.

[2.] The trial court erred by denying Appellants' motion for partial relief from the decision denying summary judgment (on the defamation claim).

[3.] The trial court erred in denying Appellants' motion to direct the verdict on Appellee's defamation claim after Appellee failed to meet her burden of proof at trial on each element of a defamation claim.

[4.] The trial court erred and abused its discretion in allowing the jury to consider, for Appellee's defamation claim, opinion statements and to decide the defamation claim on the basis of opinion statements.

[5.] The trial court erred in denying Appellants' motion for a judgment notwithstanding the verdict on Appellee's defamation claim because the four statements the jury identified as being supposedly defamatory are all subjective statements of opinion, which cannot as a matter of law give rise to defamation liability.

[6.] The trial court erred in not entering either a directed verdict or a judgment notwithstanding the verdict on attorney fees and punitive damages because Appellee did not meet her burden to prove actual damage directly caused by defamation, a prerequisite before punitive damages or attorney fees can be awarded.

[7.] The trial court erred in failing to make a reduction of the attorney fee award in consideration that Appellee failed on ½ of her claims.

{¶ 35} Gilson assigns the following errors for our review on cross-appeal:

[1.] THE TRIAL COURT ERRED IN OVERRULING PLAINTIFF'S OBJECTION TO MAGISTRATE'S DECISION ON ATTORNEY FEES AND ADOPTING MAGISTRATE'S DECISION ON ATTORNEY FEES.

[2.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR PLAINTIFF IN THE AMOUNT OF $77,275.00 IN ATTORNEY FEES FOR THE WORK OF COUNSEL MICHAEL GARTH MOORE.

### III.  APPEAL

#### A.  Defamation

{¶ 36} We address defendants' appeal first.  Initially, we note that defendants do not clearly present arguments for each of their seven assigned errors in their brief. Although defendants present seven assignments of error, they have organized their brief into five sections, making it challenging to identify which arguments are intended to support the various assigned errors.  Appellate courts "may disregard an assignment of error presented for review if the party raising it * * * fails to argue the assignment separately in the brief, as required under App.R. 16(A)."  App.R. 12(A)(2).  Nevertheless, as this court has parsed defendants' brief and identified the arguments which appear to correspond to the various assigned errors, in the interest of justice, we will address the assigned errors.

{¶ 37} Defamation is a false statement published by a defendant " 'with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.' "  *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, ¶ 9, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7 (1995).  Defamation includes both libel and slander; libel refers to written or printed defamatory words, while slander refers to spoken defamatory words.  *Woods v. Capital Univ.*, 10th Dist. No. 09AP-166, 2009-Ohio-5672, ¶ 27.  The elements of defamation, whether slander or libel, are: (1) the defendant made a false and defamatory statement concerning another, (2) the false statement was published, (3) the plaintiff was injured, and (4) the defendant acted with the required degree of fault.  *Spingola v. Stonewall Columbus, Inc.*, 10th Dist. No. 06AP-403, 2007-Ohio-381, ¶ 8.

{¶ 38} Actionable defamation falls into one of two categories: defamation per se or defamation per quod.  *Woods* at ¶ 28.  Defamation per se occurs when a statement, on its face, is defamatory.  *Id.* at ¶ 29.  As relevant herein, defamation is per se if the words tend to injure a person in their trade or occupation.  *Id.* at ¶ 28, citing *Schoedler v. Motometer Gauge & Equip. Corp.*, 134 Ohio St. 78, 84 (1938); *Bigelow v. Brumley*,

138 Ohio St. 574, 592 (1941). Whether an unambiguous statement constitutes defamation per se is a question of law. *Id.*

{¶ 39} If a statement is defamatory per se, a plaintiff " 'may maintain an action for [defamation] and recover damages, without pleading or proving special damages.' " *Woods* at ¶ 30, quoting *Becker v. Toulmin*, 165 Ohio St. 549, 553 (1956). When defamation is per se, "[p]roof of the defamation itself establishe[s] the existence of some damages." *Gosden v. Louis*, 116 Ohio App.3d 195, 208 (9th Dist.1996). When a statement is defamatory per quod, a plaintiff must plead and prove special damages. *Woods* at ¶ 30, citing *Becker* at 557.

{¶ 40} "The right to sue for damage to one's reputation pursuant to state law is not absolute"; rather, it is "encumbered by the First Amendment to the United States Constitution." *Soke v. Plain Dealer*, 69 Ohio St.3d 395, 397 (1994). In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court held that the U.S. Constitution requires that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. *Id.* at 279-80. "Prior to *New York Times*, the common law presumed malice in cases of defamation per se, thus relieving the plaintiff of any burden to plead or prove fault." *Woods* at ¶ 33, citing *Gosden* at 210. A public figure must also prove actual malice in order to recover damages for a defamatory statement. *Id.* at ¶ 34, citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162-65 (1967). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345-46 (1974), the United States Supreme Court refused to require the use of the actual malice standard in suits by private persons alleging defamation on matters of public concern.

{¶ 41} Ohio adopted the ordinary negligence standard as the standard of liability for actions involving a private individual defamed in a statement about a matter of public concern. *Landsdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180 (1987). "Thus, in Ohio, a plaintiff must prove either: (1) ordinary negligence and actual injury, in which case he can receive damages for the actual harm inflicted; or (2) actual malice, in which case he is entitled to presumed damages." *Woods* at ¶ 35.

{¶ 42} Gilson's defamation claim involved a private party alleging defamation on a matter of public concern. Because the statements tended to injure Gilson in her trade

or occupation, the statements were defamatory per se. Furthermore, because Sater made the statements to the OBN about an individual licensed by the OBN, the statements were also subject to a qualified privilege.

{¶ 43} A statement is subject to a qualified or conditional privilege if "the interest that the defendant is seeking to vindicate is conditioned upon publication in a reasonable manner and for a proper purpose." *Hahn v. Kotten*, 43 Ohio St.2d 237, 243 (1975). Thus, a statement "is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' " *Id.* at 244, quoting W. Prosser, Law of Torts, Section 115, 786 (4th Ed.1971). "A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest." *Id.*, quoting 50 American Jurisprudence 2d, Libel and Slander, Section 195, at 698 (1970). The purpose of the privilege is to ensure " 'the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty.' " *Id.* at 246, quoting *West v. People's Banking & Trust Co.*, 14 Ohio App.2d 69, 72 (4th Dist.1967).

{¶ 44} A qualified privilege "can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank*, 60 Ohio St.3d 111 (1991), paragraph two of the syllabus. The phrase "reckless disregard" applies when a publisher of defamatory statements acts with a "high degree of awareness of their probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), or when the publisher "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 218 (1988). "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant* at 732. Whether the evidence in the record supports a finding of actual

malice is a question of law. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

{¶ 45} In their objections to the magistrate's decision issued after the jury's verdicts, defendants asserted that they were entitled to immunity from Gilson's defamation claim pursuant to R.C. 4723.341. That statutes provides, in relevant part, as follows:

> (B)  In the absence of fraud or bad faith, no person reporting to the board of nursing or testifying in an adjudication conducted under Chapter 119. of the Revised Code with regard to alleged incidents of negligence or malpractice or matters subject to sections 3123.41 to 3123.50 of the Revised Code and any applicable rules adopted under section 3123.63 of the Revised Code shall be subject to either of the following based on making the report or testifying:
>
> (1)  Liability in damages in a civil action for injury, death, or loss to person or property;
>
> (2)  Discipline or dismissal by an employer.

## B.  First Assignment of Error—Summary Judgment

{¶ 46} Defendants' first assignment of error asserts that the trial court erred in denying defendants' motion for summary judgment with respect to Gilson's defamation claim. Typically, "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150 (1994), syllabus. *See also Sanders v. Mt. Sinai Hosp.*, 21 Ohio App.3d 249, 256 (8th Dist.1985) (holding that a reviewing court "need not evaluate the evidentiary materials supporting and opposing the hospital's summary judgment motion," as "[a]ny error in denying [the] motion [was] moot or harmless" after the subsequent trial demonstrated genuine issues of material fact on this subject). Indeed, to allow a decision based on less evidence to prevail over a judgment reached on more evidence would defeat the fundamental purpose of judicial inquiry. *Continental Ins.* at 157, quoting *Home Indemn. Co. v. Reynolds*, 38 Ill.App.2d 358, 365-67 (1962).

{¶ 47} However, an error in the denial of a summary judgment motion that presents a purely legal question is not rendered harmless by a subsequent trial on the merits. *Id.* at 158; *Capella III LLC v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746 (10th Dist.). " 'In other words, when the alleged error in the denial of summary judgment is based purely on a question of law that must be answered without regard to issues of fact, then the denial of summary judgment is reviewable.' " *Id.* at ¶ 14, quoting *Promotion Co., Inc./Special Events Div. v. Sweeney*, 150 Ohio App.3d 471, 2002-Ohio-6711, ¶ 15 (7th Dist.).

{¶ 48} Accordingly, we address defendants' first assignment of error only to the extent that defendants contend the trial court erred in its ruling on a purely legal issue. Appellate review of summary judgment is de novo. Byrd v. Arbors E. Subacute & Rehab. Ctr., 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Id., citing Maust v. Bank One Columbus, N.A., 83 Ohio App.3d 103, 107 (10th Dist.1992); Brown v. Cty. Commrs., 87 Ohio App.3d 704, 711 (4th Dist.1993).

{¶ 49} Defendants assert that the trial court erred in denying their motion for summary judgment because Gilson failed to "raise a question of fact that the report [to the OBN] was made under circumstances of fraud or bad faith, or even actual malice." (Appellants' Brief, 17.) However, in order to review the court's summary judgment ruling that the evidence established a genuine issue of material fact regarding whether defendants acted with actual malice, we would have to review the evidence which was before the trial court at the summary judgment stage of the proceedings.

{¶ 50} Indeed, to determine whether a statement was made with actual malice, a court on summary judgment must " 'consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff to determine whether a reasonable jury could find actual malice with convincing clarity.' " *Jackson* at ¶ 11, quoting *Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116 (1980), paragraph one of the syllabus. *See also Jacobs* at 116 (noting that determining whether statements were made with actual malice "necessitate[d] an independent review of the record to

determine whether that standard was met"). Accordingly, because the parties developed a full and complete record of the facts relating to actual malice at trial, as opposed to the limited factual record elicited through discovery at the summary judgment stage, the trial court's summary judgment ruling on actual malice was rendered moot or harmless by the subsequent trial on the merits.

{¶ 51} Defendants assert that R.C. 4723.341 "was mistakenly overlooked on summary judgment." (Appellants' Brief, 16.) Defendants, however, did not cite to this statute or otherwise bring it to the court's attention during the summary judgment proceedings. " 'Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed.' " *Mindlin v. Zell*, 10th Dist. No. 11AP-983, 2012-Ohio-3543, ¶ 18, quoting *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997). "This rule is 'deeply embedded in a just regard for the fair administration of justice' and 'impos[es] upon counsel the duty to exercise diligence in his or her own cause and to aid the court rather than silently mislead it into the commission of error.' " *Id.*, quoting *Quarto Mining Co.* at 81. "While summary judgment decisions are reviewed under a de novo standard, de novo review does not afford appellants with a 'second chance' to raise arguments they should have raised in the trial court." *Id.* Thus, as defendants failed to raise R.C. 4723.341 in their motion for summary judgment, defendants may not now contend that the trial court erred in failing to grant them summary judgment based on the statute.

{¶ 52} Defendants next contend that the trial court erred in failing to grant their motion for summary judgment on defamation, as the alleged defamatory statements were all statements of opinion. To be defamatory, a statement must be a statement of fact and not of opinion. *Fuchs v. Scripps Howard Broadcasting Co.*, 170 Ohio App.3d 679, 2006-Ohio-5349, ¶ 39 (1st Dist.), citing *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d 279 (1995). "Statements of opinion are protected speech under the Ohio Constitution." *Id.*, citing *Vail*. Whether an alleged defamatory statement is fact or opinion "is a question of law for the court." *Wampler v. Higgins*, 93 Ohio St.3d 111, 127 (2001). Accordingly, because the determination of whether the alleged defamatory statements are statements of fact or opinion presents a pure question of law, we may review the trial court's summary judgment ruling on this issue.

{¶ 53} Courts apply a totality-of-the-circumstances test to determine whether a statement is a statement of fact or of opinion. *See Vail*; *Scott v. News-Herald*, 25 Ohio St.3d 243 (1986). In reviewing the totality of the circumstances, courts should examine the following four factors: (1) the specific language used, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appears. *Id.* at 250. "This analysis is not a bright-line test," *Vail* at 282, "[t]he weight given to any one factor under this inquiry will vary depending on the circumstances of each case." *Wampler* at 126.

{¶ 54} In applying the four-part test, courts apply "an objective, reasonable-reader standard." *McKimm v. Ohio Elections Comm.*, 89 Ohio St.3d 139, 144 (2000). "All four factors of Ohio's test for distinguishing a statement of fact from an opinion depend on the reasonable reader's perception of the statement—not on the perception of the publisher." *Id.*, citing *Vail* at 282-83. *See id.* at 145 (noting that in the absence of a reasonable reader standard, "publishers of false statements of fact could routinely escape liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements").

{¶ 55} Statements which might appear to be statements of opinion "may often imply an assertion of objective fact." *Jacobs* at 119. Thus, for example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). " '[I]f an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact.' " *Scott* at 251, quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.1977).

{¶ 56} In its decision denying defendants' motion for summary judgment, the court recited the four-part test from *Vail* and concluded that the statements at issue were "factual allegations." (June 16, 2014 Decision, 6.) The court explained that defendants had "reported in an official complaint form to the Ohio nursing profession's governing body that Ms. Gilson was suffering from cognitive difficulties" and that defendants "gave examples of the types of situations in which Ms. Gilson supposedly suffered these symptoms." (June 16, 2014 Decision, 6.) The court noted that Gilson's

" 'condition,' should it exist, [was] verifiable." (June 16, 2014 Decision, 7.) The court concluded that "a reasonable jury could find–that the report to the Board involved fact rather than opinion." (June 16, 2014 Decision, 7.)

{¶ 57} Defendants initially contend that the court's conclusion that a reasonable jury could find the statements involved to be statements of fact rather than opinion, was error as "[t]he court–not the jury–must evaluate and decide each statement and determine if it was an opinion." (Appellants' Brief, 24.) However, the court did evaluate the statements and ruled that the statements were statements of fact. Moreover, the trial court's determination that a reasonable jury could find the statements to be factual was essentially a determination that a reasonable reader could find the statements to be statements of fact.

{¶ 58} Applying the four-part test, we initially consider the specific language used in the statements. *Scott* at 250. "In this regard, our focus is on 'the common meaning ascribed to the words by an ordinary reader.' " *Mehta v. Ohio Univ.*, 194 Ohio App.3d 844, 2011-Ohio-3484, ¶ 30 (10th Dist.), quoting *McKimm* at fn. 2. A reader is " 'less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning,' " and thus statements which are " ' "loosely definable" or "variously interpretable" cannot in most contexts support an action for defamation.' " *Wampler* at 128, quoting *Ollman v. Evans*, 750 F.2d 970, 979-80 (D.C.Cir.1984).

{¶ 59} At the summary judgment stage, the parties presented conflicting evidence regarding precisely what statements Sater made to Hostetler during their phone conversation. (*See* Defendants' Motion for Summary Judgment, 5; Plaintiff's Memorandum in Opposition to Summary Judgment, 8-9.) As such, for purposes of our review, we confine our analysis to the statements contained in the complaint Sater filed with the OBN on January 7, 2013 and the statements Sater made in her follow-up letter to the OBN on April 12, 2013.

{¶ 60} Reviewing the specific language used in these statements, we find that a reasonable reader would conclude that the statements were statements of fact. Sater alleged that Gilson had become ineffective in her job and provided reasons to support that allegation: Gilson was losing her cognitive abilities, as evidenced by her on the job confusion and forgetfulness. Sater gave several instances of Gilson's alleged confusion

and forgetfulness: the winter quarter schedule was not complete, faculty had not been hired, and Gilson forgot to send certain reports to the OBN by their respective deadlines. Thus, the statements amount to specific assertions of how Gilson was failing to perform her job duties as NPA. *See Mehta* at ¶ 34 (finding that the specific language used "weigh[ed] in favor of actionability," as "a reasonable reader would perceive the specific language as an assertion that appellant failed to perform his duties as an [academic] advisor"). The statements in the documents were not indefinite or ambiguous. *Compare Wampler* at 128 (noting the specific language at issue, "with Higgins describing Wampler as a 'ruthless spectator' possessed of 'self-centered greed,' " were phrases which were "all inherently imprecise and subject to myriad subjective interpretations"). Thus, the specific language used weighs in favor of actionability.

{¶ 61} We next address whether the statements were verifiable. Defendants contend that the statements were "not factually verifiable, because on summary judgment [Gilson] presented no information one way or another to 'factually' verify this." (Appellants' Brief, 25-26.) However, "whether statements are verifiable is an issue entirely distinct from whether an author, in fact, verified the statements." *Mehta* at ¶ 36, citing *Sikora v. Plain Dealer Publishing Co.*, 8th Dist. No. 81465, 2003-Ohio-3218, ¶ 20. Whether the statements are verifiable asks whether the statements are "objectively capable of proof or disproof." *Wampler* at 129. In *Scott*, for example, the court noted that an allegation of perjury was "an articulation of an objectively verifiable event" that could be proven "with evidence adduced from the transcripts and witnesses present at the hearing." *Id.* at 252. In contrast, in *Wampler*, the court noted that the allegation of Higgins that Wampler charged "exorbitant" rent and the statements describing Wampler as a "faceless," "mindless," and "heartless" corporate vendee, were statements which were not subject to objective verification. *Id.* at 129.

{¶ 62} The statements at issue were verifiable. Sater alleged that Gilson was confused and forgetful because she was not able to finish the winter quarter and had not hired faculty or assigned courses. Thus, the absence of a completed winter schedule and the absence of faculty to teach the winter courses would verify these statements. Similarly, the allegation that Gilson could not remember decisions she had communicated in written form was capable of objective verification by evidence of the

written documents containing Gilson's decisions and testimony regarding the instances in which Gilson forgot those decisions. The statements in the letter that Gilson "missed sending in a report that was due on December 5" and that Gilson "seemed to have forgotten about [the December 21] report also, it was in her email completed but unprinted and unsigned" were capable of verification by producing the OBN's time-stamped copies of the reports and by reviewing Gilson's email for the unprinted and unsigned RN progress report. (Plaintiff's Exhibit 5.) As noted by the trial court, whether one is losing their cognitive abilities is a matter capable of verification through medical analysis. Accordingly, we find that this factor weighs in favor of actionability.

{¶ 63} We next consider the immediate context of the statements. This step requires us to look at the entire written document to assess the "larger objective and subjective context of the statement." *Scott* at 252. The OBN complaint form informs its author that all complaints filed with the OBN "are kept confidential * * * and are not a public record." (Plaintiff's Exhibit 4.) The complaint instructs the author to "provide as much information as possible" about the incident, but also notes that the "Board understands that you may not know all of the information." (Plaintiff's Exhibit 4.) The complaint asks the author to "send all related documentation and witness statements confirming the violation" and instructs the author to "provide names, addresses and telephone numbers of witnesses below." (Plaintiff's Exhibit 4.)

{¶ 64} It is reasonable to presume that an individual filing a complaint with the OBN will not possess every fact or detail about the incident they are reporting. Indeed, while the complaint states that it is seeking information or facts about the subject incident, it also assures its author that the OBN understands that the author may not possess all the facts about the incident. As the complaint states that it is confidential and asks the author to supply the OBN with documents and witnesses, it indicates to its author that the OBN will investigate the statements contained in the complaint. Thus, the immediate context of the complaint indicates that the author may write statements of fact or statements of opinion and that the OBN will then investigate the statements using the documents and witnesses provided. Accordingly, viewing the complaint form objectively, we find the immediate context of the statements to be a neutral factor.

{¶ 65} The fourth factor asks us to review the broader social context of the alleged defamatory remarks. Some types of writing or speech signal to the reader the likelihood of a statement being either fact or opinion. *Wampler* at 131, citing *Ollman* at 983. For example, in *Wampler* and *Vail*, the alleged defamatory statements were contained in the forum or editorial section of a newspaper where a reader would expect to see statements of opinion. In *Scott*, the statements appeared in the sports section of the newspaper, which the court noted was "a traditional haven for cajoling, invective, and hyperbole." *Id.* at 253.

{¶ 66} Here, the statements were made in a complaint to the OBN about a nurse who is licensed by the OBN and in a follow-up letter intended to support the complaint. A complaint to the OBN is certainly different than the opinion or sports section of a newspaper, where a reader would readily expect to read statements of mere opinion. Indeed, as the OBN can use the statements made in the complaint to initiate proceedings against a nurse's license, a complaint to the OBN is not the type of document in which one would expect to read wholly unsubstantiated or vague statements of opinion. *See Rothschild v. Humility of Mary Health Partners*, 163 Ohio App.3d 751, 2005-Ohio-5481, ¶ 28 (7th Dist.) (concluding that the broader context of the statements indicated that they were statements of fact, as the statements concerned a doctor and "were made in a letter sent to the Inspector General" of the Ohio Department of Health, "a government official whose duty was to investigate and report wrongdoing"). However, as previously noted, the complaint also presupposes that its author will not possess all the facts about the incident they are reporting. Accordingly, we conclude that the broader context weighs somewhat, though not heavily, in favor of actionability.

{¶ 67} Reviewing the totality of the circumstances presented in this case, we conclude that the alleged defamatory statements in the complaint and the letter were actionable statements of fact. As such, the trial court did not err in denying defendants' motion for summary judgment on this basis.

{¶ 68} Based on the foregoing, defendants' first assignment of error is overruled.

## C. Second Assignment of Error—Civ.R. 60(B)

{¶ 69} Defendants assert that because R.C. 4723.341 "was mistakenly overlooked on summary judgment, [they] made a Rule 60 motion seeking to have that error corrected." (Appellants' Brief, 16-17.) Defendants filed the Civ.R. 60 motion for partial relief on January 12, 2015, asserting that they were entitled to relief from the court's summary judgment decision under Civ.R. 60(B)(1). Citing R.C. 4723.341, defendants asserted in the motion that "what perhaps was not articulated clear enough [by defendants] on summary judgment [was] the statutory source of the privilege and immunity enjoyed in reporting to the [OBN]." (Motion for Partial Relief, 2.) The trial court denied the motion.

{¶ 70} To prevail on a motion brought under Civ.R. 60(B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted, (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5), and (3) the motion is made within a reasonable time and, where the grounds of relief are Civ.R. 60(B)(1), (2), or (3), not more than one year after the judgment, order, or proceeding was entered or taken. GTE Automatic Elec. v. ARC Industries, 47 Ohio St.2d 146 (1976), paragraph two of the syllabus. A movant is not entitled to relief if any one of the *GTE* requirements is not met. *Strack v. Pelton*, 70 Ohio St.3d 172, 174 (1994). An appellate court reviews a trial court's denial of a Civ.R. 60(B) motion under an abuse of discretion standard. *Harris v. Anderson*, 109 Ohio St.3d 101, 2006-Ohio-1934; *State ex rel. Russo v. Deters*, 80 Ohio St.3d 152, 153 (1997).

{¶ 71} Civ.R. 60(B) provides that a "court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect." Thus, "a party may seek Civ.R. 60(B) relief only from a final judgment." *Matrka v. Stephens*, 77 Ohio App.3d 518, 520 (10th Dist.1991), citing *Jarrett v. Dayton Osteopathic Hosp., Inc.*, 20 Ohio St.3d 77, 78 (1985).

{¶ 72} "The denial of a motion for summary judgment * * * generally does not constitute a final order." *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90 (1990). A trial court's denial of a motion for summary judgment is an interlocutory decision which merges into the eventual final judgment. *Vaccariello v. Smith & Nephew Richards*,

*Inc.*, 94 Ohio St.3d 380, 386 (2002). Defendants filed their motion for Civ.R. 60(B) relief well before the trial court had issued the final judgment in this action. As such, when defendants filed their motion for partial relief, they impermissibly sought Civ.R. 60(B) relief from an interlocutory decision rather than a final order. Accordingly, the trial court properly denied the motion for partial relief. *See Harter v. Wadsworth-Rittman Hosp.*, 64 Ohio App.3d 26, 30 (9th Dist.1989) (holding that a court may not grant a party relief from a summary judgment under Civ.R. 60(B) before the summary judgment becomes a final order).

{¶ 73} Moreover, defendants attempted to use Civ.R. 60(B) to advance a new legal basis for summary judgment, which they failed to assert when moving for summary judgment in the first instance. Civ.R. 60(B) is not intended to permit parties to have "do-overs." *Adams v. Pitorak & Coenen Investments, Ltd.*, 11th Dist. No. 2009-G-2931, 2010-Ohio-3359, ¶ 84. Otherwise, a party who receives an unfavorable ruling could use Civ.R. 60(B) to have potentially unlimited opportunities to submit additional evidence or present new legal theories, "essentially asking the court each time, 'is this enough.' Such 'second bites at the apple' are not authorized by the Rules of Civil Procedure." *Id.* at ¶ 85.

{¶ 74} Based on the foregoing, defendants' second assignment of error is overruled.

### D. Third Assignment of Error—Directed Verdict

{¶ 75} Defendants' third assignment of error contends that the trial court erred in denying their motion for a directed verdict. In their appellate brief, defendants fail to differentiate between the actions of the magistrate and the actions of the trial court. However, " '[[m]agistrates] serve only in an advisory capacity to the court and have no authority to render final judgments affecting the rights of parties.' " *Roe v. Heap*, 10th Dist. No. 03AP-586, 2004-Ohio-2504, ¶ 34, quoting *Nolte v. Nolte*, 60 Ohio App.2d 227 (8th Dist.1978), paragraph two of the syllabus. "Even when a matter is referred to a magistrate, pursuant to Civ.R. 53, the trial court remains the ultimate finder of fact." *Id.* Magistrates may preside over a jury trial only by unanimous written consent of the parties. Civ.R. 53(C)(1)(c).

{¶ 76} "Magistrates are required to prepare a magistrate's decision with respect to any matter referred under Civ.R. 53(D)(1), which includes after presiding over a jury trial by consent of the parties, and when deciding a post-trial motion." *Dixon v. O'Brien*, 7th Dist. No. 09 MA 123, 2011-Ohio-3399, ¶ 28. Civ.R. 53(D)(3)(b) imposes a duty to assert timely, specific objections to a magistrate's decision before the trial court. *Triplett v. Warren Corr. Inst.*, 10th Dist. No. 12AP-728, 2013-Ohio-2743, ¶ 14. If a party fails to file such objections, he waives the right to raise all error, other than plain error, on appeal. Civ.R. 53(D)(3)(b)(iv); *Triplett* at ¶ 15.

{¶ 77} If objections are filed, a trial court undertakes a de novo review of the magistrate's decision. *See Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15. "However, the appellate standard of review when reviewing a trial court's adoption of a magistrate's decision is an abuse of discretion." *Id*. Therefore, we will only reverse a trial court's adoption of a magistrate's report if the trial court acted in an unreasonable or arbitrary manner. *Id*.

{¶ 78} Defendants moved for a directed verdict at the close of Gilson's case-in-chief on the following two grounds: (1) all the alleged defamatory statements were "statements of opinion," and (2) Gilson failed to present "any evidence of actual malice." (Tr. Vol. III, 568.) In their objection to the magistrate's decision, defendants asserted that the magistrate erred in denying their motion for a directed verdict, as Gilson failed to present evidence that defendants made the statements with actual malice, bad faith, or fraud, the statements were all statements of opinion and because Gilson failed to establish evidence of damages.

{¶ 79} The trial court overruled defendants' objection, noting that Gilson, "through the testimony of * * * Sater, other witnesses, and the reports and statements at issue," demonstrated "a reckless disregard by Defendants as to the truth or falsity of the statements." (Apr. 27, 2015 Decision, 4.) The court further concluded that as the statements were likely to injure Gilson "in her profession of nursing," the statements were defamatory per se and Gilson accordingly was not obligated to present evidence of specific damages. (Apr. 27, 2015 Decision, 5.)

{¶ 80} Civ.R. 50(A)(4) provides that a trial court must grant a motion for directed verdict if, after construing the evidence most strongly in favor of the nonmoving party, it

concludes that " 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [the nonmoving] party.' " *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14, quoting Civ.R. 50(A)(4). "The 'reasonable minds' test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3. Because a motion for directed verdict tests whether the evidence is sufficient to warrant a jury's consideration, a trial court, in deciding whether to grant a directed verdict, considers neither the weight of the evidence nor the credibility of the witnesses. *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 31.

{¶ 81} "A motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 37 (10th Dist.), citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80 (1998). Because a directed verdict only tests the sufficiency of the evidence, it presents a question of law that appellate courts review de novo. *Groob* at ¶ 14; *Goodyear Tire & Rubber Co.* at ¶ 4.

{¶ 82} Reviewing the record evidence from the close of Gilson's case-in-chief and construing that evidence in Gilson's favor, we find that there was sufficient evidence of substantive probative value to support a finding that defendants made the statements at issue with actual malice. Defendants contend that Gilson presented no evidence that defendants "believed any of the statements to the [OBN] were false." (Appellants' Brief, 35.) While "evidence of the defendant's subjective state of mind is required in order to satisfy the actual malice standard," the showing can, and in many cases must, be "satisfied by circumstantial evidence of the defendant's state of mind." *Spingola* at ¶ 12, citing *Citizens to Save Northland v. Ohio Elections Comm.*, 10th Dist. No. 01AP-115 (Dec. 27, 2001).

{¶ 83} In the complaint, Sater stated that Gilson was confused and forgetful, as she could not "remember[] if she had hired faculty." (Plaintiff's Exhibit 4.) Sater made similar allegations in the letter, stating that Gilson was "struggling with routine details,

such as following established hiring steps" and that she had not "yet hired faculty to start the quarter."  (Plaintiff's Exhibit 5.)  These statements give the impression that Gilson had failed to hire faculty to teach at AIAM.  However, Gilson testified to the extremely high turnover rate for faculty at AIAM.  AIAM regularly employed between 12 to 15 full-time instructors, and in the 15 months that Gilson was the NPA at AIAM, she "hired 32" instructors.  (Tr. Vol. II, 354.)  Thus, in her time with AIAM, Gilson effectively replaced the school's entire faculty twice.  Construing this evidence in Gilson's favor, there was some evidence in the record to support a finding that Sater acted with reckless disregard for the truth of her statements regarding Gilson's ability to hire faculty.

{¶ 84} Sater also stated in the letter that "[w]inter quarter started on December 16, 2012, yet [Gilson] kept thinking that it started January 6, 2013." (Plaintiff's Exhibit 5.)  Gilson testified that she was not confused about the start date of winter quarter, noting that she had "been consulted, actually, in changing the start date from January to December in order to avoid a site visit by one of the regulatory agencies."  (Tr. Vol. III, 465.)  Gilson presented an email which was sent to all AIAM personnel on October 8, 2012, explaining that winter quarter would begin the week of December 16, there would be a two-week break, and classes would resume on January 6.  Gilson forwarded the email to a student on October 9, 2012 stating, "[h]ere is the latest information regarding next quarter.  I was given misinformation this afternoon regarding the start date.  I hope this clarifies upcoming dates for you." (Plaintiff's Exhibit 43.)  Thus, there was evidence in the record demonstrating that Gilson was not confused about the start date of winter quarter.

{¶ 85} In the letter, Sater stated that on December 7, 2012, she "discovered that [Gilson] missed sending in a report that was due on December 5.  The report was done on November 29, ready for her signature and to send.  [Gilson] just forgot to send it." (Plaintiff's Exhibit 5.)  The trial evidence, however, demonstrated that Hiatt turned the PN progress report, which was due on December 5, 2012, into the OBN on November 29, 2012.  Hiatt's November 29, 2012 email sending the report into the OBN states that AIAM's "server [was] down," so Hiatt was sending the report in for "Gilson, RN, MS, our Nursing Program Administrator."  (Plaintiff's Exhibit 23.)  At trial, Sater

admitted that the PN progress report was never turned in late and that it was in fact turned in six days before the December 5, 2012 due date. Thus, there was probative evidence in the record indicating that Sater acted with reckless disregard for the truth of her statement when she alleged that Gilson missed sending in a report that was due on December 5.

{¶ 86} Similarly, Sater stated in the letter that the RN progress report "that was due on December 21 had not been received. [Gilson] seemed to have forgotten about this report also, it was in her email completed but unprinted and unsigned." (Plaintiff's Exhibit 5.) Gilson testified that she never forgot about the RN progress report. She testified that she was aware of the upcoming due date and stated that during the December 7 termination meeting she specifically made Hiatt aware of the upcoming December 21 due date for that report. Furthermore, Gilson testified that when Sater and Hiatt fired her on December 7, 2012, her work obligations were restricted and that she had only two obligations: "[o]ne was to sign the completion forms, and the other was to be available * * * to their phone calls." (Tr. Vol. III, 512.) Thus, as Gilson had been removed from her position at AIAM and was only available for phone calls and to sign the graduating students' completion papers, Gilson noted that it was not her responsibility to draft and send in the RN progress report on December 21, 2012. Thus, construing this evidence in Gilson's favor, there was sufficient evidence to support a finding that Sater acted with a reckless disregard for the truth of her statement when she said that Gilson had forgotten about the December 21, 2012 RN progress report.

{¶ 87} Viewing the evidence in a light most favorable to Gilson, there was sufficient probative evidence in the record to support Gilson's position that defendants acted with a reckless disregard for the truth of the statements they made to the OBN. Furthermore, the timing of AIAM's allegations against Gilson, coming only after the OBN notified AIAM that it had missed the deadline on the RN progress report, provides circumstantial evidence to bolster the conclusion that defendants acted with actual malice in making the statements they made to the OBN about Gilson. As such, the trial court did not abuse its discretion in overruling defendants' objection to the magistrate's decision with respect to the magistrate's ruling on the motion for directed verdict with respect to the issue of actual malice.

{¶ 88} Citing R.C. 4723.341, defendants contend that the trial court erred in failing to direct the verdict in their favor because Gilson "presented no evidence of malice, fraud, or bad faith." (Appellants' Brief, 30.) Defendants assert that the "trial court erred in the standard it applied at trial (that is, it should have been requiring [Gilson] to prove fraud or bad faith)." (Appellants' Brief, 38.)

{¶ 89} Defendants, however, never raised R.C. 4723.341 during the trial, and, accordingly, defendants did not move for a directed verdict based on the statute. Because defendants did not move for a directed verdict on the basis of R.C. 4723.341, and they never presented evidence or arguments during the trial with respect to R.C. 4723.341, or fraud or bad faith, they waived the right to assert that the court should have directed the verdict in their favor on the basis of the statute. *See Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 435-36 (1996) (where the defendants failed to assert the defense of primary assumption of risk either before or during the trial, the court held that defendants had "clearly waived the right to raise primary assumption of the risk as a defense" in their motion for JNOV because "requir[ing] a trial court to grant a defendant judgment as a matter of law on an issue never timely raised would fly in the face of fundamental rules of our adversarial system of trial, which place specific responsibilities on parties involved in litigation to shape the course of the trial"); *Hoover v. Sumlin*, 12 Ohio St.3d 1, 6 (1984) (noting that the "very possibility of waiver makes it extremely important and prudent, for both client and counsel, to plead all defenses as early as possible"); *Turner v. Cent. Local School Dist.*, 85 Ohio St.3d 95 (1999).

{¶ 90} Finally, defendants contend that the magistrate erred in failing to grant their motion for directed verdict because "the statements were subjective opinion statements." (Appellants' Brief, 44.) As we have previously ruled that the statements at issue were statements of fact, we find no error in the denial of the motion for directed verdict on this basis. Moreover, in *Gallagher*, the court observed that a defense which presents a question of law is not "particularly amenable to presentation in a motion for a directed verdict or in a motion for judgment notwithstanding the verdict." *Id.* at 435. Both motions ask whether reasonable minds could find that the evidence was sufficient to support the claim, and thus the "standard obviously presupposes that any questions

of law have been previously resolved, and is concerned with questions of fact that are to be submitted to the jury (directed verdict motion) or have already been submitted to the jury (motion for judgment notwithstanding the verdict)." *Id.* Thus, a motion for a directed verdict is not the proper device by which to challenge a purely legal issue, such as whether alleged defamatory statements are statements of fact or of opinion.

{¶ 91} Defendants further assert that they were entitled to a directed verdict because Gilson "confirmed she suffered no damage because of any statement made to" the OBN. (Appellants' Brief, 36.) However, this matter proceeded as a defamation per se, not a defamation per quod, case. "[I]n cases of defamation per se, the law presumes the existence of damages," and the "plaintiff 'may maintain an action for [defamation] and recover damages, without pleading or proving special damages.' " *Woods* at ¶ 30, quoting *Becker* at 553. Moreover, defendants did not move for a directed verdict on the basis that Gilson had failed to establish damages. Rather, defendants premised their motion for directed verdict on the issues of actual malice and opinion. Accordingly, as defendants did not move for a directed verdict based on the alleged lack of evidence of damages, the magistrate did not err by failing to grant their motion on this ground.

{¶ 92} Based on the foregoing, we find no abuse of discretion in the trial court's decision adopting the magistrate's ruling on the motion for a directed verdict. Defendants' third assignment of error is overruled.

### E. Fourth & Fifth Assignments of Error–JNOV & Magistrate's Ruling on Opinion Statements

{¶ 93} Defendants' fifth assignment of error asserts that the magistrate erred in denying defendants' motion for JNOV. Defendants' fourth assignment of error asserts that the trial court erred by allowing the jury to decide the defamation claim on the basis of opinion statements. Defendants contend that the magistrate should have granted their motion for JNOV "because the only statements the jury identified as being defamatory were pure opinion statements." (Appellants' Brief, 46.)

{¶ 94} A motion for JNOV is governed by Civ.R. 50(B), which provides, in relevant part, that "a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion." A motion for JNOV is used to determine whether the evidence is totally

insufficient to support the verdict. *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8. The test applied by a trial court in ruling on a motion for JNOV is the same test to be applied on a motion for a directed verdict. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). Appellate review of a ruling on a motion for JNOV is de novo. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, ¶ 14 (8th Dist.).

{¶ 95} Because the jury returned a verdict finding in Gilson's favor on her defamation claim, the jury completed interrogatory number five, which asked the jury, "[w]hat statements made by Defendants * * * about Plaintiff * * * Gilson do you find were false and that tended injured [sic] her reputation or affect her adversely in his or her trade, business or profession?" (Interrogatory No. 5.) The jury wrote in response: "Forgetfulness, confusion, anger, inability to perform her job adversely affecting her fitness to practice as a nurse." *Id.*

{¶ 96} Before instructing the jury, the magistrate ruled on which of the alleged defamatory statements were statements of opinion. The magistrate had Gilson's counsel submit a list of statements which Gilson asserted were defamatory. Defendants' counsel went through each statement on the list and argued why each particular statement was a statement of opinion. Following defense counsel's discussion of the statements, the magistrate ruled that the statement which Sater made during her initial phone conversation with Hostetler, stating that "Ms. Gilson was confused," was a statement of opinion. (Tr. Vol. V, 1060.) The magistrate cautioned, however, that the other statements concerning confusion, such as "she became ineffective in her role due to [forgetfulness and confusion]," were "different." (Tr. Vol. V, 1060.) The magistrate ruled that the other statements regarding confusion from the complaint and the letter were "related to job performance issues or being up to the job and having poor job performance" and were therefore statements of fact. (Tr. Vol. V, 1069.)

{¶ 97} Defendants contend that they "attempted to go through the other statements on [Gilson's] list, to identify why those included statements of opinion," but assert that the "trial court became impatient and seemed unwilling to spend time separately evaluating each statement on the list," thereby forcing defendants to argue "in a general fashion, why all items on the list were opinions." (Appellants' Brief, 40.)

However, defendants' counsel did make an argument with respect to every statement on Gilson's list. The magistrate was under no obligation to permit defendants to make a second round of arguments after the magistrate made her ruling. The record does not support defendants' contention that they were forced to make arguments in a general fashion.

{¶ 98} In moving for JNOV, counsel noted that the words the jury listed on interrogatory number five did "not seem to refer to any specific statements, but rather it sound[ed] like they were almost reciting the phraseology in the jury instruction." (Tr. Vol. VI, 1229.) Counsel also argued that "the court did not specifically instruct this jury you must write down a specific statement and context" on the interrogatory. (Tr. Vol. VI 1231.) The magistrate reminded counsel that "you all agreed to jury instructions whereby those specific statements were not put into the jury instructions and instead summary statements of what each side asserted was defamatory were put in." (Tr. Vol. VI, 1233.) The magistrate had instructed the jury that Gilson's defamation claim against defendants was "for the written and oral statements made about her to the [OBN] regarding [Gilson's] alleged forgetfulness, confusion, anger, and inability to perform her job, adversely affecting her fitness to perform her job." (Jury Instructions, 8-9.)

{¶ 99} Indeed, prior to instructing the jury, defense counsel asked the magistrate if it was the magistrate's intention to read "the statements as part of the jury instructions, the statements in contention by each side." (Tr. Vol. V, 1065.) The magistrate noted that instructing the jury on each specific statement seemed like "quite a lot," and the magistrate indicated that it would be better to have the parties go through the specific statements "in closing arguments." (Tr. Vol. V, 1065-66.) Defense counsel agreed and added that with respect to the interrogatories, "[r]ather than have interrogatories asking * * * is this statement defamatory," the court should "just give the generic defamation instruction" and then ask the jury to state in the interrogatory "which words do you find were defamatory statements." (Tr. Vol. V, 1066-67.) Gilson's counsel agreed to this method of structuring the jury instructions and the interrogatories.

{¶ 100} Notably, neither party objected to the wording of the jury instructions or the interrogatories. Moreover, neither Gilson's counsel nor defendants' counsel went

through the specific statements during their closing arguments, and neither attorney told the jury to write down specific statements as opposed to keywords in their interrogatory responses.

{¶ 101} Thus, in ruling on the motion for JNOV, the magistrate concluded that defense counsel had "waived that argument with regard to a requirement that the specific statements for each side had to be presented to the jury." (Tr. Vol. VI, 1233-34.) The magistrate stated that if counsel "wanted the specific statements for each side to go in and for the jury to rule on each defamatory statement * * *, that motion should have been made before closing." (Tr. Vol. VI, 1240-41.) Defendants' counsel argued that the magistrate should grant the motion for JNOV at least with respect to the jury's interrogatory response of "confusion," as the magistrate had previously ruled that Sater's statement during the phone conversation that "Ms. Gilson was confused" was a statement of opinion. (Tr. Vol. V, 1060.) The magistrate noted, however, that she had also ruled that the other statements in the complaint and in the letter concerning confusion were statements of fact.

{¶ 102} The magistrate denied the motion for JNOV, noting that the "jury did what it was asked to do." (Tr. Vol. VI, 1243.) The magistrate held that "to the extent that the court ruled that confusion, the verbal comment the plaintiff was confused, could not go to the jury did not mean that the other written comments related to confusion did not go to the jury, and specifically they did." (Tr. Vol. VI, 1244.)

{¶ 103} Defendants objected to the magistrate's decision, asserting that the magistrate erred in allowing the jury to consider opinion statements and in wrongly denying defendants' motion for JNOV. The court overruled defendants' objections to the magistrate's decision noting that it was apparent that the jury "used keywords to identify various statements submitted under [Gilson's] defamation claim." (Apr. 27, 2015 Decision, 6.) The court observed that "if Counsel want[ed] the jury to name the exact statements," then counsel should have provided that information to the jury. (Apr. 27, 2015 Decision, 6.) The court noted that it was "unreasonable of Counsel to expect jurors to remember the exact phrases word for word from memory" and that counsel "had the opportunity to submit selected jury instructions and other various

inclusions; it [was] at that time that Counsel should have raised these issues."  (Apr. 27, 2015 Decision, 6.)

{¶ 104} The court also reviewed the statements in interrogatory number five and concluded that "reasonable minds could find said statements being of fact and not opinion."  (Apr. 27, 2015 Decision, 6.)  The court noted while the magistrate had ruled that the one statement regarding confusion from the phone conversation was a statement of opinion, the magistrate had also ruled that the other statements regarding confusion were statements of fact.  The court concluded that the jury properly made its findings of fact based on "what was selected and approved by Counsel."  (Apr. 27, 2015 Decision, 7.)

{¶ 105} Initially, as previously noted, because a motion for JNOV is intended to test the sufficiency of the evidence, it is not particularly amenable for use as a device to resolve purely legal issues, such as whether defamatory statements are statements of opinion.  *Gallagher*.  Nonetheless, we agree with the trial court's analysis that the jury used keywords to identify the various defamatory statements that defendants made about Gilson in different contexts. We have previously found that the statements contained in the complaint and the letter were statements of fact and not statements of opinion.  The words confusion, forgetfulness, and anger were used throughout those various statements.  Accordingly, the magistrate properly refused to grant defendants' motion for JNOV regarding whether the statements the jury identified were statements of opinion.

{¶ 106} Defendants further assert that Gilson did not present evidence of defendants making the statement: "inability to perform her job adversely affecting her fitness to practice as a nurse."  (Interrogatory No. 5.)  However, Hostetler testified that Sater stated during their phone conversation that Gilson "was confused and unable to function in her role as a nurse" and that "Gilson was confused and not able to function in her role."  (Tr. Vol. II, 308, 310.)  Accordingly, there was sufficient evidence in the record from which the jury could find that Sater made this defamatory statement about Gilson.  Defendants also assert that this statement was a statement of opinion.  We disagree.  Whether Gilson was unable to perform her job was capable of objective verification by testimony and documentary evidence showing the job duties that Gilson

was unable to accomplish. Additionally, because Gilson's job as an NPA required that she hold a registered nursing license, her ability or inability to perform her job reflected on her ability to be a nurse. *See* Ohio Adm.Code 4723-5-10(A)(1)(d).

{¶ 107} Defendants assert that "[t]he jury was given no instruction on the concept that opinion statements are not considered defamatory." (Appellants' Brief, 46.) However, the trial court asked defense counsel if she had any objections to the jury instructions, and counsel stated that she had "[n]o objections." (Tr. Vol. V, 1080.) *See* Civ.R. 51(A) (stating that absent plain error, a party waives any challenge to jury instructions in a civil case unless that party "objects before the jury retires to consider its verdict"); *Allied Erecting Dismantling Co. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, ¶ 79 (7th Dist.) (noting that "[t]he standard a trial court uses to rule on a JNOV motion, * * * has nothing whatsoever to do with whether a jury instruction was correct or incorrect"). Defendants do not present any assignment of error regarding the jury instructions. As this court rules "on assignments of error only, and will not address mere arguments," we will not address defendants' mere arguments regarding the magistrate's jury instruction. *Ellinger v. Ho*, 10th Dist. No. 08AP-1079, 2010-Ohio-553, ¶ 70.

{¶ 108} Moreover, defense counsel invited the very error of which she now complains. Counsel had the opportunity to request that the jury be instructed on each defamatory statement and had an opportunity to object to the wording of interrogatory number five. Counsel declined both opportunities, and instead expressly asked the court to not instruct the jury on each alleged defamatory statement. The doctrine of invited error holds that a litigant may not " 'take advantage of an error which he himself invited or induced.' " *Agarwal v. Bansal*, 10th Dist. No. 00AP-732 (Mar. 30, 2001), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986). "Invited error requires that counsel induced the error or was actively responsible for it." *Id. See Myer v. Hoops*, 5th Dist. No. 04CA03, 2004-Ohio-6136 (because the entry resolving the contempt matter was agreed to by the parties, the appellant invited any error associated with it and waived any legitimate objection on appeal).

{¶ 109} Based on the foregoing, we conclude that the jury did not allow opinion statements to go to the jury as defendants contend, and we find no abuse of discretion in

the trial court's decision overruling defendants' objection to the magistrate's ruling on JNOV. Based on the foregoing, defendants' fourth and fifth assignments of error are overruled.

### F. Sixth Assignment of Error—Damages

{¶ 110} Defendants' sixth assignment of error asserts that the trial court erred in not entering a directed verdict or a JNOV on attorney fees or punitive damages because Gilson did not establish proof of actual damage. However, defendants never moved for a directed verdict or for JNOV during the punitive damages/attorney fees portion of the trial. Although defendants' counsel argued during that phase of the trial that Gilson was not entitled to punitive damages or attorney fees because she had not presented evidence of actual damages, counsel never made a motion for a directed verdict or a motion for JNOV on that basis. Rather, defendants moved for a directed verdict and for JNOV only during the liability portion of the trial and made those motions based on the alleged lack of evidence of actual malice and on the assertion that the statements were statements of opinion. Defendants did not premise either motion on the lack of actual damages.

{¶ 111} Accordingly, as defendants did not move for a directed verdict or for JNOV on attorney fees or punitive damages based on the lack of evidence of actual damages, we cannot find error in the trial court's alleged failure to enter a directed verdict or JNOV on that basis. Accordingly, we overrule defendants' sixth assignment of error.

## IV. ATTORNEY FEES

### A. Defendants' Seventh Assignment of Error—Hours

{¶ 112} Defendants contend that the trial court abused its discretion by awarding Gilson the fee award it did. Defendants assert that because Gilson "failed on her primary claim (discrimination), which at least represents one half of the entire time her attorney spent on the case," the trial court should have reduced Gilson's fee award by one-half. (Appellants' Brief, 50.)

{¶ 113} In its decision on attorney fees, the magistrate concluded that it was impossible to divide the time Gilson's counsel spent on the claims after December 4, 2013, which was the first time Gilson's counsel billed time in relation to her defamation

claim. The magistrate stated that she based this finding on "her observation of the presentation of evidence and argument at trial," which demonstrated that the claims "involved a common core of facts related to ageism allegations and defamatory statements related to [Gilson's] termination, and that all of the work on the case directly related and/or so inter-related with the winning defamation claim that it [was] impossible for the Magistrate to separate [Gilson's] fees after December 4, 2013." (Mar. 27, 2015 Magistrate's Decision, 18.) The magistrate deducted the 36.9 hours that Gilson's counsel billed on the case prior to December 4, 2013 from the total number of hours that Gilson's counsel billed on the case. The magistrate used the resulting figure of 309.1 hours to compute the "lodestar" figure.

{¶ 114} Defendants filed an objection to the magistrate's decision on attorney fees, asserting that the magistrate erred by failing to properly divide the hours Gilson's counsel expended on the successful, as opposed to the unsuccessful, claims. The trial court overruled defendants' objection. The court agreed with the magistrate's conclusion that Gilson's successful and unsuccessful claims shared a common core of facts and similar legal theories, such that the "claims were so intertwined as to make it impossible for the Court to divide [Gilson's] counsel's time between successful and unsuccessful claims." (Apr. 29, 2015 Decision, 4.)

{¶ 115} We review an award of attorney fees for an abuse of discretion, asking whether the court's attitude was unreasonable, arbitrary, or unconscionable. *Miller v. Grimsley*, 197 Ohio App.3d 167, 2011-Ohio-6049, ¶ 11 (10th Dist.). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Furthermore, a reviewing court should not interfere with a fee award unless the amount of fees determined is so high or so low as to shock the conscience. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991), quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist.1985).

{¶ 116} " 'Ohio has long adhered to the "American rule" with respect to recovery of attorney fees: a prevailing party in a civil action may not recover fees as part of the cost of litigation.' " *Miller* at ¶ 12, quoting *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 7. An exception to this rule exists where punitive damages are

awarded in tort cases involving fraud, insult, or malice. *Id.*, citing *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 183 (1975). If punitive damages are proper, reasonable attorney fees may be awarded as an element of compensatory damages. *Id.*, citing *Galmish v. Cicchini*, 90 Ohio St.3d 22, 35 (2000). An award of attorney fees may stem from an award of punitive damages, but "the attorney-fee award itself is not an element of the punitive-damages award." *Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, ¶ 16.

{¶ 117} In *Bittner*, the Supreme Court of Ohio set forth a two-step analysis to determine the amount of attorney fees. First, the trial court must calculate the "lodestar" by multiplying the number of hours reasonably expended by an hourly rate. Second, the court may adjust the lodestar amount based on the reasonableness factors listed in Prof.Cond.R. 1.5(a). *Id.* at syllabus (applying the predecessor to Prof.Cond.R. 1.5(a)); *Am. Chem. Soc. v. Leadscope, Inc.*, 10th Dist. No. 08AP-1026, 2010 Ohio 2725, ¶ 88. The factors in Prof.Cond.R. 1.5(a) include the time and labor required; the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly; the amount involved and the results obtained; the experience, reputation, and ability of the lawyer or lawyers performing the services; and whether the fee is fixed or contingent.

{¶ 118} *Bittner* also instructed that "the trial court must award fees only for the amount of time spent pursuing the claim for which fees may be awarded." *Id.* at 145. However, "this is only so where it is *possible* to separate claims in such a manner." (Emphasis sic.) *Miller* at ¶ 17. If the claims for relief involved "a common core of facts or will be based on related legal theories," then counsel's time "will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Thus, "where multiple claims are rooted in the same allegations, facts, discovery, and legal arguments, a trial court does not abuse its discretion in awarding attorney fees for the time spent on the claims." *Edlong Corp. v. Nadathur*, 1st Dist. No. C-120369, 2013-Ohio-1283, ¶ 16. Moreover, a court should not reduce an attorney fee award based simply on a ratio of successful claims. *Miller* at ¶ 16.

{¶ 119} Thus, the relevant question is "not merely whether [the party requesting fees] failed to divide fees on a claim-by-claim basis, but whether it was possible to divide the fees in such a manner." *Id.* at ¶ 19. If the fees can "not be divided, either because the claims involved a common core of facts or related legal theories, then the trial court was permitted to award fees for the time reasonably expended pursuing all claims— guided by consideration of any relevant factors in Prof.Cond.R. 1.5(a)." *Id. See also Luft v. Perry County Lumber & Supply Co.*, 10th Dist. No. 02AP-559, 2003-Ohio-2305, ¶ 34 (noting "when claims not covered under the [Consumer Sales Practices Act ("CSPA")] involve a common core of facts with claims arising under the CSPA, then the court may award attorney fees for all time reasonably spent pursuing all claims"); *Edlong Corp.* at ¶ 18; *Hustler Cincinnati, Inc. v. Elm 411, LLC*, 1st Dist. No. C-130754, 2014-Ohio-5648, ¶ 30.

{¶ 120} Gilson presented evidence that it was not possible to separate the hours on a claim-by-claim basis. At the hearing on attorney fees, Moore testified that he could not have separated his hours on the case, noting that his "focus was equally on defamation and discrimination." (Tr. Vol. VII, 1400.) Moore observed that he would have called the same witnesses and taken the same depositions if the case had concerned only the defamation claim or only the age discrimination claim.

{¶ 121} Defendants contend that "[t]he pleadings themselves, with the testimony in the case, clarify that [Gilson's] defamation is based on a distinguishable set of facts." (Appellants; Brief, 50.) Although Gilson filed the age discrimination claim first and later amended her complaint to add the defamation claim, that procedural fact does not demonstrate that the claims were divisible. Moreover, Landrum testified that Sater stated she fired Gilson both because she was "too old" and because she was "incompetent, couldn't get the job done." (Tr. Vol. III, 533.) Defendants further contend that the claims were based on distinguishable facts because the age discrimination claim concerned actions leading up to Gilson's discharge, while the defamation claim concerned statements which occurred after Gilson's discharge. We disagree. Although AIAM made the defamatory statements about Gilson after she was discharged, the defamatory statements predominately concerned the events which led up to Gilson's discharge.

{¶ 122} The defamation claim and the age discrimination claim involved a common core of underlying facts. Both claims concerned Gilson's employment relationship with AIAM and, more specifically, the breakdown in that employment relationship. Gilson challenged in her age discrimination claim that AIAM fired her for age-related reasons. AIAM made the defamatory statements about Gilson to the OBN to purportedly explain their reasons for terminating Gilson. Thus, the two claims both centered around the end of Gilson's employment relationship with AIAM. Sater also admitted that she understood that "these descriptions, forgetful, confused, irritable, losing cognitive abilities, * * * those are all stereotypes for older people." (Tr. Vol. I, 101-02.)

{¶ 123} Accordingly, because the claims involved a common core of underlying facts and the magistrate did deduct the hours from the beginning of the case which were solely attributable to the age discrimination claim, the trial court did not abuse its discretion in overruling defendants' objection to the magistrate's decision on attorney fees. Based on the foregoing, defendants' seventh assignment of error is overruled.

## B. Cross-Appeal

{¶ 124} Gilson presents two related assignments of error on cross-appeal, jointly asserting that the trial court abused its discretion by adopting the magistrate's decision to use $125 an hour as Gilson's trial counsel's hourly rate for purposes of determining the lodestar figure.

{¶ 125} During the attorney fee hearing, Gilson presented the testimony of her trial counsel, Michael Garth Moore, and the expert testimony of John Marshall. Gilson also introduced into evidence her fee agreement with Moore. In the agreement, Gilson contracted to pay Moore $125 an hour and, "[i]n addition to the hourly fee," to pay him 30 percent of any recovery obtained for her in the case. (Fee Agreement, ¶ 2.) The fee agreement further provided that if the court were to make an award of fees, Moore and Gilson agreed that "a reasonable hourly fee for [his] services, given [his] education, experience and skill, is $375.00 per hour."[1]  (Fee Agreement, ¶ 4.)  The agreement

---

[1] We note that this paragraph of the fee agreement appears to only apply to cases brought in federal court, as it states that "the federal court may make an award of attorney fees" and that if we "bring your lawsuit in federal court." (Fee Agreement, ¶ 4.)

stated that the fee Gilson owed Moore under the agreement would be the greatest of the following three options: "a. 30% of the value of any recovery obtained by settlement or trial plus the hourly fee agreed in ¶1; b. If [Gilson] prevail[ed] at trial, the amount of fees payable by the defendants, as ordered by the court; or c. If [Gilson] prevail[ed] at trial, 30% of the value of any recovery plus 30% of the amount of any attorney fees payable by the Defendant as ordered by the court." (Fee Agreement, ¶ 4.)

{¶ 126} Moore explained that he developed this "mixed hourly and contingent" structure "in order to reduce the extraordinary risk [he] had on a contingent agreement." (Tr. Vol. VII, 1408.) Moore explained that by charging a reduced hourly rate to his client, there was a "baseline modest amount of money that comes in that reduces the risk, but then there's an incentive at the end, if we're successful." (Tr. Vol. VII, 1408.) Moore also stated that, pursuant to paragraph four of the agreement, "if the case goes to a verdict and a judgment and I get awarded fees, then under 4(B) [of the] contract, my client doesn't pay anything." (Tr. Vol. VII, 1409.) Moore further explained that if the court's fee award was "less than the total award of fees that I would get out of the calculation of the 30 percent, then the client would simply pay the difference." (Tr. Vol. VII, 1410.)

{¶ 127} Marshall testified that he is familiar with the billing rates and billing practices for attorneys in central Ohio. Marshall stated that charging a 30 to 40 percent contingency fee was standard "throughout the practice" and that a fee of $375 an hour was "within the market rate for lawyers of [Moore's] background, skill, and experience." (Tr. Vol. VII, 1374.) Marshall noted that his own hourly rate was $450 an hour. Marshall also stated that he "either [has] hourly clients or contingency clients," as he has not used a mixed hourly and contingent fee structure before.[2] (Tr. Vol. VII, 1388.)

---

[2] Defendants do not directly challenge the reasonableness of Moore's fee structure. Although this court's independent research has not produced an Ohio case discussing the reasonableness of such a mixed fee, we note that other jurisdictions have found this type of fee structure reasonable. *See Pub. Employees Retirement Bd. v. Cacioppo*, 813 P.2d 679, 685, fn. 14 (Alaska 1991) (noting that "[a]lthough the combined hourly and contingent fee arrangement was unconventional, it was not unreasonable"); *Gilbert v. Evans*, 822 So.2d 42, 46 (La.App.2002) (finding the "hybridized contingent-hourly fee agreement" permissible, as there was "no law prohibiting this hybrid contingency fee contract nor has any court declared such contracts invalid because they are against public policy"); *People v. Gregson*, 2010 Colo. Discipl. LEXIS 81 (Aug. 31, 2010) (where the fee agreement obligated the client to pay her attorney 33 1/3 percent contingent fee and $150 an hour, which was "roughly half of what he would normally charge on

Marshall also stated that the number of hours that Moore had billed on the case was reasonable.

{¶ 128} In her decision, the magistrate stated that she had arrived at the following lodestar amount: "$38,637.50 or 309.10 hours multiplied by the hourly rate charged to Plaintiff of $125 an hour." (Mar. 27, 2015 Magistrate's Decision, ¶ 33.) The magistrate never explained why an hourly rate of $125 was reasonable for Moore. To the contrary, in reviewing the Pro.Cond.R. 1.5(a) factors, the magistrate expressly stated that the "hourly rate of $125.00 an hour [was] shockingly low and unreasonable." (Mar. 27, 2015 Magistrate's Decision, ¶ 40.)

{¶ 129} " '[I]t is axiomatic that a court speaks through its journal' " entries. *Foster v. Blue Cross/Blue Shield*, 10th Dist. No. 97APE03-410 (Dec. 11, 1997), quoting *Bittmann v. Bittmann*, 129 Ohio St. 123, 127 (1934). Thus, when the trial court overruled Gilson's objection to the magistrate's decision and adopted that decision as its own, it adopted both the magistrate's finding that $125 an hour was a shockingly low and unreasonable hourly rate and at the same time awarded the hourly rate of $125. In overruling Gilson's objection, the court stated simply that it was "the Magistrate's choice to utilize the contract price [of $125] as the starting fee, which was then adjusted according to *Bittner* to compensate Plaintiff's counsel with a fee determined as reasonable for his time and work, expertise, experience, etc." (Apr. 29, 2015 Decision, 3.)

{¶ 130} The *Bittner* analysis requires a court to undertake two steps to determine an award of attorney fees. In the first step, the court determines the lodestar figure by taking " 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' " *Id.* at 145, quoting *Hensley* at 433. *See also Yoder v. Hurst*, 10th Dist. No. 07AP-121, 2007-Ohio-4861, ¶ 21 (noting that the "procedure for determining an appropriate award involves calculating the number of hours reasonably expended on the case, multiplied by a reasonable hourly rate"). It is only "[a]fter the requesting party has 'adequately proven an appropriate number of hours worked and

---

an hourly basis," the court concluded that the "fee agreement did not violate Colo. RPC 1.5(a)"). *See also Burlington v. Dague*, 505 U.S. 557, 560 (1992) (observing that "[f]ees for legal services in litigation may be either 'certain' or 'contingent' (or some hybrid of the two)").

the attorney's reasonable hourly fee, [that] the trial court may modify the baseline calculation by considering the factors listed in * * * Prof. Cond. R. 1.5.' " *Columbus Truck & Equip. Co. v. L.O.G. Transp., Inc.*, 10th Dist. No. 12AP-223, 2013-Ohio-2738, ¶ 19, quoting *Nordquist v. Schwartz*, 7th Dist. No. 11 CO 21, 2012-Ohio-4571, ¶ 23.

{¶ 131} The procedure used by the magistrate and adopted by the trial court did not comport with the two-step analysis described in *Bittner*. The court erred in the first step of the *Bittner* analysis by using a "shockingly low and unreasonable" hourly rate to compute the lodestar figure. (Mar. 27, 2015 Magistrate's Decision, ¶ 40.)

{¶ 132} The magistrate used the $125 an hour rate because that was the rate Gilson agreed to pay Moore in their contract. However, " '[a] fee is not reasonable merely because it was paid by the client.' " *Hikmet v. Turkoglu*, 10th Dist. No. 08AP-1021, 2009-Ohio-6477, ¶ 86, quoting *B-Right Trucking Co. v. Interstate Plaza Consulting*, 154 Ohio App.3d 545, 2003-Ohio-5156, ¶ 100. A court should not award a particular hourly fee "merely because that was the amount agreed upon between the party seeking fees and its attorneys." (Emphasis omitted.) *B-Right Trucking Co.* at ¶ 70. Moreover, the magistrate made no attempt to explain how $125 an hour could be a reasonable hourly rate for an attorney of Moore's skill, experience, and reputation. *See Unick v. Pro-Cision, Inc.*, 7th Dist. No. 09 MA 171, 2011-Ohio-1342, ¶ 29, quoting *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984) (noting that in order to establish the reasonable hourly rate, the party should " 'produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation' ").

{¶ 133} The trial court overruled Gilson's objection to the magistrate's decision stating that "[w]hat constitutes a reasonable hourly rate is a matter within the Court's discretion." (Apr. 29, 2015 Decision, 3.) While we agree that the reasonableness of an attorney's hourly fee is within the court's discretion, here the magistrate abused her discretion by using an hourly rate which she deemed to be "unreasonable." (Mar. 27, 2015 Magistrate's Decision, ¶ 40.) Indeed, a court abuses its discretion when it acts in an unreasonable manner. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 134} Based on the foregoing, we sustain Gilson's two assignments of error on cross-appeal. The trial court abused its discretion by adopting the magistrate's decision which used an unreasonable hourly rate to compute the lodestar figure. As such, we must remand the matter for the trial court to recalculate the lodestar figure using a reasonable hourly rate and to then re-assess the Prof.Cond.R. 1.5(a) factors.

## V. CONCLUSION

{¶ 135} Having overruled defendants' seven assignments of error, but having sustained Gilson's two assignments of error on cross-appeal, we affirm in part and reverse in part. We affirm the judgments of the Franklin County Court of Common Pleas denying defendants' motion for summary judgment, denying defendants' Civ.R. 60(B) motion for partial relief from judgment, and overruling defendants' objections and adopting the magistrate's decision issued after the jury's verdicts. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas overruling the objections and adopting the magistrate's decision on attorney fees and remand the cause for proceedings consistent with this decision.

*Judgments affirmed in part and reversed in part;*
*cause remanded.*

BROWN and HORTON, JJ., concur.

_____